**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **MARY A. BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 2:05CV75MLM** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Jo

Anne B. Barnhart ("Defendant") denying the application of Mary A. Brown ("Plaintiff") for Social

Security benefits under Title II of the Social Security Act, 42 U.S.C. § § 401 et seq. and for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381

et seq. Plaintiff has filed a brief in support of the Complaint. Doc. 13. Defendant has filed a brief in

support of the Answer. Doc. 14. The parties consented to the jurisdiction of the undersigned United

States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). Doc. 6.

## I.
## PROCEDURAL HISTORY

Plaintiff filed applications for disability benefits alleging a disability onset date of September

20, 2003. (Tr. 35, 92-94). Plaintiff claimed she was disabled due to bulging disc, fibromyalia,

headaches, and chronic bronchitis. (Tr. 161). The applications were denied.[1] (Tr. 69-73). Plaintiff

---

[1]     Missouri is one of several test states participating in modifications to the disability
determination procedures which apply in this case. See 20 C.F.R. § § 404.906 and 404.966
(2002). These modifications include, among other things, the elimination of the reconsideration
step and at times, the elimination of the Appeals Council review step in the administrative appeals
process. See id. Therefore, Plaintiff's appeal in this case proceeded directly from her initial denial
of benefits to the administrative law judge level.

requested a hearing, which was held December 7, 2004, before Administrative Law Judge ("ALJ") Craig Ellis. (Tr. 336). By decision dated June 22, 2005, the ALJ determined that Plaintiff was not under a disability as defined in the Social Security Act. (Tr. 12-21). On September 24, 2005, the Appeals Council denied Plaintiff's request for review. (Tr. 3-5). As such, the decision of the ALJ becomes the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

Plaintiff testified that, at the time of the hearing, she was forty-eight years old; that she was 5'4" tall and weighed 220 pounds; and that she was living with her daughter and grandchildren. (Tr. 340-41). She also testified that she completed twelve years of education; that her past work included waitress, packer, certified nurse's assistant, and housekeeper; and that she also worked in a garment factory as a seamstress. (Tr. 341,343-46).

Plaintiff testified that she has pain in her neck, back and head; that she has headaches which make her dizzy; that her hands and arms go numb; and that she has muscle spasms in her arms and lower back. (Tr. 346, 353). Plaintiff also testified that she was seeing a mental health specialist for problems including anxiety attacks, stress, family problems and emotional issues; that she has panic attacks which last "about a half-hour, 45 minutes"; and that she has not been admitted to a hospital for mental health problems. (Tr. 348, 350). Plaintiff testified both that, at the time of the hearing, her panic attacks occurred twice a week and that they occurred three or four times a week. (Tr. 350-51). Plaintiff further testified that since she had surgery her symptoms have gotten worse; that right after her surgery feeling returned to her fingers and arms; and that subsequent to her having surgery she has had a burning sensation from her neck to her mid shoulders and her fingers and arms have started tingling and going to sleep. (Tr. 354). Plaintiff said that she has to lie down "at least three times a

day" because of her headaches; that if her headaches last more than three days she goes to the emergency room; that she cancelled a doctor's appointment because she did not "have a way to get there"; that a doctor recommended that she go to neurology for migraine headaches; and that she has to wait to do this until she has insurance. (Tr. 356-57).

Plaintiff said that she is suppose to take sleep medication nightly; that she takes it every couple of days; that when she takes the medication she sleeps "good"; that when she takes the medication she sometimes has nightmares and is sluggish the next day; and that four days a week she is sluggish as a result of taking the sleep medication. (Tr. 349).

Plaintiff testified that she has a hard time carrying a carton of milk; that she can "pick up" her grandchild who weighs thirty pounds; and that she cannot carry the grandchild. (Tr. 354).

## III.
## MEDICAL RECORDS

An intake history from the Arthur Center dated May 9, 1991, reflect that Plaintiff's diagnosis was:

> Axis I: Adjustment disorder with anxious mood. 309.24 Marital problems. V61.10
> Axis II: Deferred.
> Axis III: None known.
> Axis IV: Psychosocial stressors; acute events Code 2 moderate, martial problems (she has been married for 6 months). Enduring circumstances Code 2 moderate. Married to a husband who is apparently afflicted with some form of psychotic disturbance; is guardian for grandparents in a nursing home; has problems regarding her own parents; has virtually sole care of her two children (husband makes care difficult, doesn't really represent any help to her).
> Axis V: GAF current 60; past year 60.

(Tr. 307).

A progress note from the Arthur Center dated September 26, 1991, states that Plaintiff's insight and judgment were fair; that Plaintiff's diagnosis included adjustment disorder with anxious mood; and that Valium was prescribed. (Tr. 306).

A progress note from the Arthur Center dated January 16, 1992, states that Plaintiff was in family counseling and that her diagnosis included adjustment disorder with anxious mood, resolved, and marital problems, continuing. (Tr. 305).

A progress note from the Arthur Center dated March 12, 1992, states that Plaintiff's diagnosis included adjustment disorder with anxious mood, resolving, and marital problems, continuous; that Plaintiff was to continue in family counseling; and that Valium and Doxepin were prescribed. (Tr. 304).

A progress note from the Arthur Center dated May 23, 1992, states that Plaintiff's mood was depressed and that the diagnosis was depressive disorder NOS and marital problems, continuous. (Tr. 303).

A progress note from the Arthur Center dated July 25, 1992, reflects that Valium was prescribed on this date and provides the following diagnosis: Axis I, generalized anxiety disorder, stable, adjustment disorder with anxious mood, resolved, and marital problems, resolved; Axis II, no diagnosis; and Axis III, hyperthyroidism under treatment. (Tr. 302).

A progress note from the Arthur Center dated December 3, 1992, states that Plaintiff was to enter into individual psychotherapy; that her diagnosis included generalized anxiety disorder and hyperthyroidism, currently under treatment; and that Valium was prescribed. (Tr 300).

A progress note from the Arthur Center dated February 11, 1993, states that a mental status examination showed that Plaintiff was well groomed, appropriately dressed, friendly, and cooperative; that she had good eye contact and appropriate hand interaction in conversation; that her affect was appropriate; that her mood was neutral; that her thought flow was organized; that she had negative ideation of self harm or harm to others; that she was oriented in all spheres; and that her insight and

judgment were good. Notes also reflect that she was to return to the outpatient clinic in eight weeks. (Tr. 298).

Records of the Arthur Center dated February 14, 1993, state that Plaintiff's diagnosis included generalized anxiety disorder, adjustment disorder, depressed mood, and hyperthyroidism and that Valium was continued and Trazodone was prescribed. (Tr. 299).

A progress note from the Arthur Center dated March 18, 1993, states that Plaintiff continued to have episodic bouts of anxiety and that her diagnosis included generalized anxiety disorder, adjustment disorder with depressed mood, resolving, and hypothyroidism by history. (Tr. 297).

A progress note from the Arthur Center dated April 15, 1993, states that Plaintiff was well groomed and fairly cooperative; that she had good eye contact with some fidgeting of the hands; that she spoke at a normal rate with no neologisms or paraphasias; that she was anxious; that her thought flow was organized; that she had no ideation of self harm or harm to others; that she was oriented in all spheres; that her judgment and insight were good; and that she was to return to the outpatient clinic in two to three months. (Tr. 296).

A progress note from the Arthur Center dated August 19, 1993, reflects that Plaintiff indicated that her sleep was poor and that she had periods of anxiousness; that her diagnosis was generalized anxiety disorder and hypothyroidism, by history; and that Valium was continued and Trazodone was prescribed. (Tr 295).

A progress note from the Arthus Center dated January 6, 1994, states that Plaintiff was well groomed, friendly, and cooperative; that she made good eye contact and had appropriate hand interaction; that she was not as anxious as in the past; that her mood was "O.K."; that she had no delusions or hallucinations; that she had negative ideation of self harm or harm to others; that she was

oriented in all spheres; that her judgment and insight were good; and that she was to return to the outpatient clinic in two to three months or as needed. (Tr. 293).

A progress note from the Arthur Center dated March 10, 1994, states that Plaintiff's prescription of Valium was continued and that the diagnosis was as follows: Axis I, generalized anxiety disorder, stable; Axis II, no diagnosis; Axis III, hypothyroidism, under treatment; Axis IV, psychosocial stressors, mild; and Axis V, "GAF current 70, past year 65." (Tr. 292).

A progress note from the Arthur Center dated August 2, 1994, reflects that Plaintiff indicated that she continued to experience a great deal of stress and that the diagnosis was generalized anxiety disorder. (Tr. 291).

A progress note from the Arthur Center dated September 27, 1994, states that Plaintiff indicated that she had been under increased stress; that she reported occasional insomnia and that her mood remained anxious and dysphoric; and that the diagnosis was generalized anxiety disorder. (Tr. 290).

A progress note from the Arthur Center dated December 20, 1994, reflects that Plaintiff's mood was mildly anxious and mildly dysphoric; that Plaintiff stated that she was under considerable stress recently and that she had ongoing financial problems; that Plaintiff was alert, cooperative, and appropriately dressed and groomed; that Plaintiff's thought processes were well organized; that the diagnosis was generalized anxiety disorder; and that Valium was prescribed. (Tr. 289).

A progress note from the Arthur Center dated August 8, 2000, states that Plaintiff's mood appeared to be stable; that the diagnosis was generalized anxiety disorder; and that diazepam was prescribed. (Tr. 288).

Records of the Audrian Medical Center dated November 27, 2000, March 22, 2001, and August 16, 2001, reflect that Plaintiff's diagnosis was generalized anxiety disorder, in remission, and that Diazepam and Valium were prescribed. (Tr. 285-87).

Records of the Audrain Medical Center dated January 10, 2002, reflect that the diagnosis was generalized anxiety disorder, in sustained remission. (Tr. 284). Records of the Audrian Medical Center dated February 19, 2002, reflect that Plaintiff was generally sad and depressed; that she said that she tried some cocaine and that she felt guilty about doing that; that Plaintiff was motivated for treatment; that her diagnosis included generalized anxiety disorder in sustained remission and cocaine abuse; and that Valium was prescribed. (Tr. 282).

Records of the Audrain Medical Center dated March 28, 2002, reflect that Plaintiff's diagnosis was generalized anxiety disorder, in remission, and cocaine abuse, early remission, and that Valium and Zoloft were prescribed. Records of this date state that Plaintiff reported that she was doing "very well" on Zoloft; that it "helps a lot"; that she was not using cocaine; that she did have "a few cravings, but she can handle herself pretty well"; and that she was not depressed. (Tr. 281).

Charles Tillman, M.D., reported reflect that Plaintiff was admitted to the hospital on July 25, 2002, and that a left heart catheterization, coronary arteriography, and left ventriculogram were performed. (Tr. 173-75). The impression upon Plaintiff's discharge included: chest pain, non-cardiac, minimal left ventricular dysfunction; hypertension, treated with medical management; history of hypothyroidism with a history of Hashimoto's thyroiditis; status post cholecystectomy, appendectomy, and bilateral tubal ligation. (Tr. 175).

Dr. Tillman's notes reflect that he saw Plaintiff for follow-up on October 2, 2002; that "since discharge she has been doing well and her blood pressure is well controlled"; that her heart was

regular in rate and rhythm; that her chest was clear; and that her extremities were without edema. (Tr. 172).

Records of the Audrain Medical Center reflect that Plaintiff was seen in the emergency room on January 4, 2003, after having strained her neck and that the diagnosis was cervical strain, possible cervical disk disease. (Tr. 192).

Imran Chishti, M.D., reported on January 9, 2003, that Plaintiff's diagnosis was generalized anxiety disorder, in remission, and cocaine abuse, sustained full remission and that Valium and Zoloft were prescribed. (Tr. 279).

Karl D. Harmston, M.D., of the Audrain Medical Center, reported on February 10, 2003, that Plaintiff was seen in the emergency room on this date with complaints of a three-day headache and that the diagnosis was sinusitis with a vestibular neuronitis. (Tr. 188).

Notes Dr. Chishti of the Arthur Center state that Plaintiff was seen on April 2, 2003; that the diagnosis was generalized anxiety disorder, in remission, and cocaine abuse, in early remission; that Valium and Diazepam were prescribed; and that Plaintiff was to see Sandy Nolan in about four to five months. (Tr. 278).

Notes of George D. Comfort, M.D., of the Audrain Medical Center state that Plaintiff was seen in the emergency room on May 4, 2003, after slipping and twisting her left knee and that the diagnosis was strain of the left knee lateral ligament. (Tr. 183).

Records further reflect that Plaintiff was seen in the Audrain Medical Center emergency room on May 11, 2003; that her diagnosis included acute left knee sprain; that it was recommended that Plaintiff stay off work twenty-four to forty-eight hours; and that Plaintiff was given a knee immobilizer. (Tr.180).

Records of the Arthur Center reflect that Plaintiff was seen on October 2, 2003; that the diagnosis was generalized anxiety disorder, in remission, and cocaine abuse, in early remission; and that Diazepam and Valium were prescribed. It was also reported on this date that Plaintiff denied being depressed and that she reported that Valium had "been most helpful to her and she ha[d] no side effects"; that she no longer used cocaine; that she was attending Narcotics Anonymous; and that she felt "overall that her condition [was] stable." (Tr. 196).

Rebecca B. Kelley, M.D., reported that Plaintiff was seen on October 6, 2003. Dr. Kelley's diagnosis on this date was hypertension, hypothyroidism, gastroesophageal reflux disease, stable, and chronic obstructive pulmonary disease, stable. Plaintiff was continued on Triamterene/Hydrochlorothiazide, Lisinopril, Synthroid, Ranitidine, Albuterol, and Premarin. (Tr. 214).

On October 31, 2003, Dr. Kelley reported that Plaintiff complained of generalized aches and pains; that Plaintiff had a history of fibromyalgia; that Plaintiff's diagnosis was fibromyalgia; that on examination Plaintiff had full range of motion in all joints including the back, her gait was normal and her strength was 5/5; and that Prednisone was prescribed. (Tr. 211).

Records of Richard Rattay, M.D., reflect that Plaintiff was seen on December 29, 2003, for complaints of low back pain and left upper extremity pain. Dr. Ratty reported that Plaintiff's gait and station were normal; that she was able to undergo exercise testing and/or participate in exercise program; that she had tenderness of the midline only on the left diffusely moderate in intensity, no muscle spasm, or stepoff; that she had normal range of motion, and muscle strength; and that her upper extremity joints, bones, and muscles were normal; that her right upper extremity joints, bones, and muscles were normal; and that inspection of her left wrist and hand were normal, with tenderness present in the thumb. Dr. Rattay also reported on this date that Plaintiff had normal mental status,

judgment and insight. Dr. Rattay's assessment on this date included the following: (1) osteoarthrosis, which was localized, primarily in the hand, stable, bilateral, with minimal risk; (2) left thumb base arthritis and left wrist deQuervaines; (3) discogenic back pain; (4) bilateral stable joint pain, with minimal risk; and (5) radial styloid tenosynovitis, which was stable, bilateral, with minimal risk. (Tr. 222-25).

Dr. Scott Clarke's records reflect that he saw Plaintiff on December 29, 2003, for complaints of low back pain and neck pain radiating into the thoracic region and that the diagnosis was lumbar radiculopathy. (Tr. 220).

Robert Trout, M.D., reported that he saw Plaintiff for an electro diagnostic evaluation on January 19, 2004, and that upon examination Plaintiff had no pain with hip internal or external rotation, no significant tenderness along the lumbar spinous processes, mild tenderness in the lower lumbosacral paraspinal region bilaterally, no significant edema in the lower extremities, and intact tibial pulses. Dr. Trout further reported Plaintiff had "increased exertional activity localized to the bilateral lumbar paraspinal muscles in L4, L5, nerve root distribution. There were no radicular findings observed in the lower extremities. Findings most commonly associated with underlying degenerative changes or possibly a lumbar spinal stenosis." He also reported that "[t]here was otherwise no electromyographic evidence of aplexopathy, myopathy or peripheral neuropathy." (Tr. 233-34)

Jay D. Crockett, D.O., reported that his impression of an MRI of the lumbar spine done at Lafayette Regional Health Center on January 20, 2004, was as follows:

1. Left lateral disc protrusion at the L2-L4 level resulting in mild to moderate left neural foraminal stenosis.
2. Circumferential disc bulging at the L4-L5 level resulting in mild bilateral neural foraminal stenoses. Fluid signal resides deep to the annulus at this level, which may reflect evidence of an annular tear.

3. Circumferential disc bulging at the L5-S1 level which results in mild bilateral neural foraminal stenoses. In addition, fluid signal resides deep to the annulus at this level, which may reflect evidence of an annular tear.

(Tr. 231).

Dr. Crockett reported that his impression from an x-ray of Plaintiff's left hand done at Lafayette Regional Health Center on January 20, 2004, was as follows:

1. Degenerative changes involving the first carpometacarpal joint. In addition, an irregular osseous density is present projecting volar/radial to the first carpometacarpal joint. This finding may be a manifestation of degenerative joint disease, however, an age-indeterminate fracture in this region cannot be excluded. Clinical correlation would be recommended.
2. Cortical irregularity is present involving the dorsal aspect of the distal metaphysis/epiphysis of the third metacarpal on the lateral view. This finding is not specific, however may be a manifestation of previous trauma.

(Tr. 232).

Dr. Kelley reported that Plaintiff was seen for follow-up of her back pain on February 24, 2004, and that the plan on this date included symptomatic treatment and follow up with an orthopedist. (Tr. 206).

Notes of Sandy J. Nolan, R.N., C.S., of the Arthur Center, reflect that Plaintiff was seen on April 1, 2004, on which date the diagnosis was generalized anxiety disorder and cocaine abuse, in remission. Diazepam and Seroquel were prescribed. Nurse Nolan reported on this date that Plaintiff felt that the psychotropic medication which she was taking was helpful to her; that Plaintiff felt that individual counseling might help her; that Plaintiff had no psychotic symptoms; that she was stabilized on her psychotropic medication; and that Plaintiff would return in six months or sooner. (Tr. 274).

Curtis S. Cox, M.D., reported that he saw Plaintiff on May 7, 2004, for complaints of "generalized pain from her head to her feet." Dr. Cox reported that Plaintiff's musculoskeletal examination was "totally WNL"; that her gait and station were normal; and that she had "100% full range of motion in all the joints in all the extremities." Dr. Cox also reported that Plaintiff's reflexes

were physiologic, and that her motor and sensory examinations were normal. Dr. Cox's diagnosis on this date was chronic generalized pain. (Tr. 247-48).

Dr. Kelley's notes of May 11, 2004, reflect that Plaintiff had complaints of neck pain radiating up into the back of her head and across both shoulders and that the diagnosis was chronic neck pain. (Tr. 204).

Records of the Audrain Medical Center reflect that Plaintiff was seen on May 18, 2004, for complaints of a headache in the left temporal area radiating to the front and that her diagnosis was migraine headache. (Tr. 255).

Dr. Kelley's notes reflect that she saw Plaintiff on May 26, 2004, for complaints of left thumb pain/swelling, a knot on her thumb, and intermittent parasthesias. (Tr. 203). The diagnosis on this date included left thumb pain/swelling with intermittent parasthesias/2-3 mm cystic nodule, possibly due to CMC arthritis/tenosynovitis/CTS/ganglion cyst or combination thereof, gastroesophageal reflux disease, hypertension, and hypothyroidism." (Tr. 203).

E. Dwain Roberts, M.D., reported that his impression from a complete spine myelogram performed at St. Mary's Health Center on June 10, 2004, was "[m]ild to moderate and moderate broad-based disk bulges at L3-L4through L5-S1 respectively" and "[m]oderate broad-based disk osteophytic bulge at C5-C6 with mild encroachment upon cervical cord." (Tr. 242). Dr. Roberts further reported that his impression from a cervical and lumbar spine post-myelogram CT also done on June 10, 2004, was that "[a]t C5-C6, there [was] a central distal osteophytic protrusion measuring 4.1 mm in AP dimension"; that "[t]here [was] encroachment upon the cord"; "[a]t L4-L5, there [was] a mild broad-based disk bulge"; and that " [t]here [was] no neuroforaminal encroachment or disk herniation. (Tr. 243).

Dr. Cox reported on June 12, 2004, that Plaintiff's diagnosis was hypertrophic cervical spondylosis with disk-osteophyte complex at 5-6 with spinal canal stenosis and generalized pain. Dr. Cox further reported that in his best opinion, Plaintiff was likely to benefit from anterior cervical diskectomy and osteophyte at 5-6 with interbody fusion and internal stabilization. (Tr. 249).

Records of St. Mary's Health Center reflect that on July 13, 2004, Plaintiff had an anterior cervical diskectomy and osteophytectomy at C5-C6 and interbody fusion with Cloward dowel from the bone bank and internal stabilization with Synthes plate C5-C6 and that her post operative diagnosis was disk osteophyte complex, C5-C6,with neck and bilateral arm pain. (Tr. 239). Records reflect that on July 14, 2004, Plaintiff was "doing O.K." and was discharged.

In a Medical Assessment of Ability to do Work-Related Activities (Mental) Nurse Nolan, reported on July 15, 2004, that, "[c]lient has history of anxiety symptoms treated with Diazepam, only seen twice by this interviewer, has been seen by Dr. Chishti and Dr. Frisch. (Tr. 244).

Records of the Audrain Medical Center reflect that Plaintiff was seen in the emergency room on July 21, 2004, with complaints of neck pain and that her diagnosis was status-post cervical fusion. (Tr. 262)

Dr. Cox reported that he saw Plaintiff for follow-up on August 4, 2004. He reported on this date that Plaintiff "has improved significantly but the migraine headaches that initially improved seem to be returning." Dr. Cox recommended that Plaintiff be referred to neurology for the migraine headaches and to rheumatology for her generalized arthritis. (Tr. 251)

Plaintiff was seen at the Audrain Medical Center emergency room on August 16, 2004, with complaints of a headache. Records of this visit reflect that the diagnosis was headache, acute/severe. (Tr. 269).

John R. Hall, M.D., of the Arthur Center reported on August 30, 2004, that Plaintiff was watching her grandchildren; that she was oriented; that she made good eye contact; that she had fair hygiene; that her thoughts were goal-directed; she had "no psychotic sx" or "intent to harm self or others"; that she denied "current sx depression"; and that his assessment was generalized anxiety. (Tr. 275).

Dr. Hall reported on November 23, 2004, and December 16, 2004, that Plaintiff had good eye contact; that her mood was depressed; that she had no current thoughts of hurting herself or others; that she had "no psychotic sx" and that the assessment was generalized anxiety disorder. Also, on December 16, 2004, Dr. Hall reported that Plaintiff said she was "coping day to day [with] BF problems." (Tr. 276, 328). Dr. Hall reported on February 11, 2005, that his assessment was generalized anxiety disorder. (Tr. 329). Diazepam and Seroquel were prescribed by Dr. Hall on these dates. (Tr. 275-276, 328-329).

Deborah Wright, M.D., evaluated Plaintiff on February 11, 2005. (Tr. 311-19). Dr. Wright noted that Plaintiff had a history of numerous jobs from which she was terminated or quit after a short period of employment and that Plaintiff had a reported history of conflict with employers and terminations when she over stepped work boundaries, in particular overstepping boundaries with residents of senior centers where she has been employed. (Tr. 313). Dr. Wright reported that the MMPI-2 was administered to Plaintiff and that Plaintiff's "MMPI-2 profile is unable to be interpreted due to prominent indicators of invalidity. Significant elevations on the F and F(B) scales, coupled with extremely low scores on the K and L scales indicate that she may be exaggerating symptoms and negative characteristics. ... Therefore, it is highly likely, [Plaintiff's] profile is invalid and thus unable to be interpreted." (Tr. 318). Dr. Wright's diagnosis was as follows: Axis I, Generalized anxiety disorder, by previous report, Alcohol abuse, by history, and Cocaine abuse, by history; Axis II, No

Diagnosis; Axis III, Fibromyalgia, back problems, HBP/heart value problems; Axis IV, Financial; and Axis V, 80. (Tr. 319). Dr. Wright also reported that Plaintiff reported that she spends approximately one hour a day on the computer instant messaging friends; that she cooks for her father; that she takes him to appointments; and that she reads and watches television. Dr. Wright reported that anger is Plaintiff's biggest trigger of intense affect, including racing thoughts, edginess, and irritability. (Tr. 318).

Dr. Wright completed a Medical Source Statement of Ability to do Work-Related Activities (Mental), on February 14, 2005, in which Dr. Wright reported that Plaintiff had no restrictions in regard to her ability to understand, remember, and carry out instructions and in regard to interacting appropriately with the public. Dr. Wright further reported that Plaintiff had slight restrictions in regard to interacting appropriately with supervisors, co-workers and responding appropriately to changes in routine working conditions. (Tr. 320-322). In an addendum to the Medical Source Statement, also dated February 14, 2005, Dr. Wright reported that Plaintiff's "employment record reflects a history of conflict with supervisors" and that Plaintiff reported "a history of anger management problems" including that she was verbally and physically abusive toward her children when they were adolescents. Dr. Wright further reported that Plaintiff's sobriety from alcohol and cocaine are tenuous; that she attends NA twice a month; and that it was recommended that Plaintiff become actively engaged in a recovery program to ensure her continuation of sobriety. (Tr. 323-25).

Nurse Nolan completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) on March 14, 2005.[2] Nurse Nolan reported that Plaintiff had a fair ability in regard to making occupational adjustments, performance adjustments, and personal-social adjustments with the exception of use adjustment, functioning independently, and relating predictably in social situations

---

[2] Plaintiff states that this Assessment was incorrectly dated 2004. Doc. 13 at 11.

in which areas Nurse Nolan opined that Plaintiff's ability was poor to none. Nurse Nolan also noted that Plaintiff was easily stressed with limited coping skills and that she had lack of motivation, could not concentrate, and was easily distracted and tearful. (Tr. 332-33).

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 788, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 591; Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will "review [claimants'] residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R.

§ § 416.920(f), 404.1520(f). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person's with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) (holding that the at Step 5 the burden of production shifts to the Commissioner, although the Commissioner is to required to reestablish the RFC which the claimant must prove at Step 4). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." Eichelberger, 390 F.3d at 590-91.

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo.  McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Instead, the district court must simply determine  whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion.  Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).  Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).  See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence").  Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted).  See also Eichelberger,  390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A). The plaintiff has the burden of proving that he has a disabling impairment. 42 U.S.C. § 423(d)(1); Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993); Roach v. Sullivan, 758 F. Supp. 1301, 1306 (E.D. Mo. 1991).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health and Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record,

observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing.  Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 849 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 426 (8th Cir. 1988).  The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  The ALJ need only acknowledge and consider those factors. Id.   Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc).  The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983).  Second, once the plaintiff's capabilities are

established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 180; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

## V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ erred in finding that she does not suffer from a severe mental impairment; that the ALJ did not explain why Plaintiff's record of treatment at the Arthur Center over a period of many years would not demonstrate more than a slight hindrance to the ability to work; "that it is certainly difficult to believe that the ongoing treatment over may years and regular administration of medications does not indicate a problem severe enough to have more than a minimal effect on the ability to work"; that the ALJ should have inquired further from Nurse Nolan; that the ALJ's decision was not supported by substantial evidence in this regard; and that, therefore, the ALJ's use of the Medical-Vocational Guidelines was improper.

## A.    Plaintiff's Alleged Mental Impairment:

At Step 2 of the sequential analysis, the ALJ found that while Plaintiff has generalized anxiety disorder, alcohol and cocaine abuse in remission, she does not have a severe mental impairment. 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) provides, in regard to mental impairments, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

20 C.F.R. §404.1520a(a) states that the steps for determining whether a claimant is disabled as set forth in §404.1520 also apply to the evaluation of a mental impairment. However, other considerations are included. A special procedure must be followed at each level of administrative review. 20 C.F.R. § 404.1520a; Pratt v. Sullivan, 956 F.2d 830, 834 n.8 (8th Cir. 1992) (per curiam).

The first step is to record pertinent signs, symptoms and findings to determine if a mental impairment exists.[3] 20 C.F.R. § 404.1520a(b)(1). These are gleaned from a mental status exam or psychiatric history and must be established by medical evidence consisting of signs, symptoms and laboratory findings. 20 C.F.R. §§ 404.1520a(b)(1).

The mere existence of a mental condition is not per se disabling. Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). Where a claimant's mental or emotional problems do not result in a marked restriction of his daily activities, constriction of interests, deterioration of personal habits, or impaired ability to relate, they are not disabling. Gavin v. Heckler, 811 F.2d 1195, 1200 (8th Cir. 1987). See also 20 C.F.R. § § 404.1520a and 416.920a.

---

[3]    Section 12.00(a) further lists mental impairments in diagnostic categories, which include, among others, mental disorders (§ 12.02), affective disorders (§ 12.04), mental retardation (§ 12.05), anxiety related disorders (§ 12.06), and personality disorders (§ 12.08).

If a mental impairment is found, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. See 20 C.F.R. § 404.1520a(b)(1). The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. See 20 C.F.R. § 404.1520a(c)(3). Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. See 20 C.F.R. § 404.1520a(c)(3).

The limitation in the first three functional areas of activities of daily living (social functioning, and concentration, persistence, or pace) is assigned a designation of either "none, mild, moderate, marked, [or] extreme." See 20 C.F.R. § 404.1520a(c)(4). The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When the degree of limitation in the first three functional areas is "none" or "mild" and "none" in the area of decompensation, impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). When it is determined that a claimant's mental impairment(s) are severe, the ALJ must next determine the impairment(s) meet or are equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2). If it is determined that a claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

Additionally, 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether

these limitations have lasted or are expected to last for a continuous period of at least 12 months.

The ALJ in the matter under consideration concluded that Plaintiff does not have a severe mental impairment. Upon reaching this conclusion, consistent with the Step 2 of the analysis applicable to evaluation of an alleged mental impairment, the ALJ considered reports and treatment notes including Nurse Nolan's report of April 1, 2004 in which she diagnosed Plaintiff with generalized anxiety disorder and cocaine abuse in remission and Nurse Nolan's report in July 2004 that she was unable to evaluate Plaintiff because of the *limited contact* she had with Plaintiff. The ALJ considered December 16, 2004 and February 11, 2005 notes of Dr. Hall of the Arthur Center in which Dr. Hall reported that Plaintiff said she was coping day to day with her relationship problems and that she was able to sleep by taking prescribed medication. The ALJ concluded that Nurse Nolan's opinion expressed in the Assessment of March 2004[4] that Plaintiff had little or no ability to tolerate work stress was inconsistent with Dr. Hall's findings that Plaintiff was well oriented, had a calm affect, no psychotic symptoms, good eye contact and no suicidal ideation and was inconsistent with Plaintiff's statement to Dr. Hall that she was coping with her relationship problems. While it is not clear if Nurse Nolan's Assessment was actually done in March 2004 or March 2005, the court notes that nonetheless Nurse Nolan's treatment notes of April 2004 state that Plaintiff was stabilized on her psychotropic medication; that she was being seen on a six month basis; that she was attending Narcotics Anonymous; and that Plaintiff had no psychotic symptoms. The record does not include treatment notes from Nurse Nolan which would support Nurse Nolan's conclusion that Plaintiff had little or no ability to tolerate work stress.

---

[4] While Plaintiff states that the date of Nurse Nolan's Assessment should have been 2005 rather than 2004 as indicated on the Assessment, the ALJ referred to this Assessment as being from 2004.

In regard to Plaintiff's contention that the ALJ should have recontacted Nurse Nolan, the court notes that the ALJ's duty to develop the record includes the duty to develop the record as to the medical opinion of the claimant's treating *physician*. First, Nurse Nolan is not an acceptable medical source as defined by the Regulations. 20 C.F.R. § § 404.1513(a) and 416.913(a). Rather, she is considered an "other" source pursuant to the Regulations. 20 C.F.R. § § 404.1513(d)(1) and 416.913(d)(1). Second, the Regulations provide at 20 C.F.R. § 404.1624(c)(3) that "[i]f the evidence is consistent but we *do not have sufficient evidence* to decide whether you are disabled, or if after weighing the evidence we decide we cannot reach a conclusion about whether you are disabled, we will try to obtain additional evidence under the provisions of §§ 404.1512 and 404.1519 through 404.1519h. We will request additional existing records, recontact your treating sources or any other examining sources, ask you to undergo a consultative examination at our expense, or ask you or others for more information." Where the record, however, contains medical records and opinions of doctors, each of whom evaluated the claimant's limitations, an ALJ need not recontact the claimant's treating *doctor*. Id. Additionally, "[w]hile the ALJ has an independent duty to develop the record in a social security disability hearing, the ALJ is not required 'to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)). Because ALJ correctly found the record sufficiently developed to determine whether or not Plaintiff suffered from a severe mental impairment and because Nurse Nolan is not an acceptable medical source, the ALJ was not required to recontact Nurse Nolan.

In regard to Plaintiff's claim that her extensive treatment at the Arthur Center establishes that she has a severe impairment, the court notes that while Plaintiff's medical records reflect that she was frequently seen at the Arthur Center between May 1991 and December 1994, she alleges a disability

onset date of September 2003. Indeed, the ALJ considered that Plaintiff did not seek regular mental health treatment during the relevant period. The record reflects that after Plaintiff's alleged onset date Plaintiff was seen at the Arthur Center by Nurse Nolan in April 2004 and by Dr. Hall in August, November, and December 2004 and twice in February 2004. As stated above, Nurse Nolan reported in July 2004 that she was unable to complete a residual functional capacity form for Plaintiff because of the *limited contact which she had with Plaintiff*. Thus, the record establishes that Plaintiff did not receive extensive treatment for her alleged mental impairment during the relevant period. See Rautio v. Bowen, 862 F. 2d 176, 179 (8th Cir. 1988) (failure to seek aggressive treatment is not suggestive of disability). Plaintiff's seeking limited medical treatment is inconsistent with her claim of disability based on a mental impairment. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). Moreover, the court notes that in August 2004, Dr. Hall reported that Plaintiff was oriented and goal-directed and that she denied "current sx depression"; in November and December 2004 he noted that Plaintiff had fair hygiene and good eye contact although her mood was depressed; and in February 2005 he reported that Plaintiff had fair hygiene and good eye contact.

In regard to Plaintiff's limited treatment the ALJ correctly considered that while Plaintiff has a relatively low income there was no evidence that she was ever refused treatment or medication for any reason including insufficient funds. In some circumstances, failure to seek medical treatment based on inadequate financial resources may explain a plaintiff's failure. Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). Where a claimant's financial resources are insufficient, however, failure to seek treatment offered to indigents detracts from a claim that a claimant did not seek medical treatment because of inadequate financial resources. See Riggins, 177 F.3d at 693.

Upon determining that Plaintiff does not suffer from a severe mental impairment the ALJ also considered the report prepared by Dr. Wright who saw Plaintiff for a consultive examination. In particular the ALJ considered that Dr. Wright reported that Plaintiff may have exaggerated her symptoms; that Plaintiff self-diagnosed some of her alleged mental and physical conditions; that Plaintiff was inconsistent in seeking rehabilitation for her cocaine addiction; that Plaintiff had slight to no limitations in her ability to relate to the public, supervisors, and coworkers and no limitations in regard to her ability to understand, remember, and carry out even detailed work instructions; and that Plaintiff had a global assessment of functioning ("GAF") of 80. GAF is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate,"scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

Consistent with the requirement of § 404.1520(a), after considering the medical evidence, the ALJ proceeded to consider Plaintiff's functional limitations as evidenced by activities of daily living and her social functioning as required by 20 C.F.R. § 404.1520a(b)-(c). The ALJ considered Plaintiff's daily activities. The ALJ considered that Plaintiff testified that at the time of the hearing she was driving an automobile, doing laundry in her basement, washing dishes in her basement; that on her application Plaintiff indicated she went shopping once a week, prepared simple meals, went to the post office, watched her grandchildren, read, drove daily up to sixteen miles, and had no trouble getting along with other people; and that she told a consultive examiner that she spends one

hour at her computer daily instant messaging friends, that she cooks for her father and takes him to appointments. In regard to Plaintiff's ability to function socially, the ALJ concluded that Plaintiff's daily communication with friends and indication that she has no problems getting along with people are factors inconsistent with an inability to relate adequately to others due to disabling anxiety. While the undersigned appreciates that a claimant need not be bedridden before she can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with Plaintiff's subjective complaints of a disabling impairment. See Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992); Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992). As such, the court finds that the ALJ's findings regarding Plaintiff's daily activities are supported by substantial evidence on the record and that the ALJ's findings in this regard are consistent with the Regulations.

For the reasons fully set forth above, the court finds that the ALJ's decision that Plaintiff does not suffer from a severe mental impairment is supported by substantial evidence.

**B.** **Medical Vocational Guidelines:**

Plaintiff alleges that the ALJ should not have relied upon the Medical-Vocational Guidelines (the "Guidelines") upon determining that there is work which she can perform. First, the court notes that the ALJ concluded at Step 2 of the sequential analysis that Plaintiff did not suffer a severe mental impairment. He further concluded that Plaintiff does not have an impairment or combination of impairments listed in, or medically equal to any Listing shown in Appendix 1, Subpart P Regulations No. 4. To the extent that the ALJ concluded that Plaintiff does not have a severe impairment, the ALJ was not required to proceed further with the sequential analysis. Goff, 421 F.3d at 790.

The ALJ, however, further concluded that Plaintiff has the RFC to perform work which involves frequent lifting over ten pounds or occasionally lifting over twenty pounds; that she can stand and walk for six hours in an 8-hour workday and sit for six hours in an 8-hour workday with usual breaks; and that she has no other exertional or nonexertional limitations. As such, the ALJ concluded that Plaintiff was unable to perform her past relevant work as a nurse assistant, packer or housekeeper but that she is able to perform the full range of light work. (Tr. 19). Relying on the Guidelines the ALJ concluded that there are jobs existing in significant numbers in the national economy which Plaintiff can perform and that, therefore, she is not disabled. (Tr. 19-20).

Resort to the Guidelines is appropriate when there are no non-exertional impairments that substantially limit the ability of a claimant to perform substantially gainful activity. Once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). See also Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines. See Robinson, 956 F.2d at 839. If, however, the claimant is also found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. See id. that SSR 83-10, 1983 WL 31251, at * 6, defines a nonexertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl,

reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at \*7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities."

The ALJ did not find that Plaintiff had a mental impairment. The only limitations which he found are in regard to her ability to lift; he also found that she can stand, walk, and sit for six hours in an 8-hour workday. None of the limitations which the ALJ found that Plaintiff has are categorized as nonexertional. Under such circumstances, pursuant to the Regulations, the ALJ was permitted to rely on the Guidelines. The court finds, therefore, that the ALJ's reliance on the Guidelines is consistent with the Regulations and that his decision in this regard is supported by substantial evidence on the record.

## VI.
## CONCLUSION

The court finds that the ALJ's decision is supported by substantial evidence contained in the record as a whole, and that, therefore, the Commissioner's decision should be affirmed.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Brief in Support of Complaint is **DENIED;** [13]

**IT IS FURTHER ORDERED** that separate Judgement shall be entered in favor of Defendant and against Plaintiff in the instant cause of action and incorporating this Memorandum Opinion.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of August, 2006.